# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ALVIN ACEVEDO (01) and
YESENEA COLLAZO (02),

    Defendants.

Case No. 16-40109-DDC

## MEMORANDUM AND ORDER

On November 14, 2016, Lieutenant Justin Stopper of the Geary County Sheriff's Department stopped a grey Ford Fusion on Interstate 70 for following the car in front of it too closely, and because an item or items in the windshield appeared to block the driver's view. Defendant Alvin Acevedo was driving this Ford Fusion, and defendant Yesenea Collazo was sleeping in the backseat. After Mr. Acevedo pulled onto the shoulder and parked, Lieutenant Stopper approached the Fusion from the passenger side and interacted with the driver. Some six minutes later, Lieutenant Stopper called for a K-9 Unit to the scene. The drug dog alerted to the car. Later, officers would find more than 18 pounds of heroin hidden in a compartment under the Fusion's front passenger seat.

On December 14, 2016, Mr. Acevedo and Ms. Collazo were indicted on one count of possession with intent to distribute a controlled substance under 21 U.S.C. § 841(a) and 18 U.S.C. § 2. Doc. 1. On June 19, 2017, Mr. Acevedo and Ms. Collazo filed separate Motions to Suppress, asking the court to exclude evidence of the heroin found during the traffic stop. Docs. 18, 19. The court held an evidentiary hearing on July 10, 2017. The court has considered the

parties' briefing and evidence, and now is prepared to rule. It denies Mr. Acevedo and Ms. Collazo's Motions to Suppress.

I.     **Factual Background**

In the afternoon of November 14, 2016, Lieutenant Justin Stopper of the Geary County Sheriff's Department was in his patrol car, sitting in the median of Interstate 70 near mile-marker 303 in Geary County, Kansas. At around 2:30 p.m., he noticed a grey Ford Fusion driving eastbound on the highway. He believed this Fusion was following the car in front of it, a maroon Prius, too closely to comply with Kansas law. Lt. Stopper testified that he visually marked a line on the road, watched the Prius pass that line, then counted how many seconds it took for the Fusion to pass the same line. Based on this method, he determined that the Fusion was following about one second behind the Prius. The video taken from his patrol car's front-facing camera contains a timer. While this timer is not calibrated to tenths of a second in the fashion used at present day sporting events, it shows that about one second elapsed between the Prius crossing the line chosen by Lt. Stopper and the Fusion crossing it. Exs. 1, 2, 3 (front-facing camera at :53). As the Fusion passed his patrol car, Lt. Stopper also noticed a "whole lot of stuff" in the Fusion's windshield. Ex. 1 (front-facing camera at about minute 3:56). He believed that this "stuff" illegally obstructed the driver's view. So, Lt. Stopper turned on his emergency lights and sirens, pursued the Fusion, and turned on his patrol car's front-facing camera.

When Lt. Stopper turned on his front-facing camera, it automatically re-wound one minute and began recording. As this recording shows, the Fusion, driven by Mr. Acevedo, pulled to the shoulder of the road. Lt. Stopper then radioed the Fusion's New York license plate number to his dispatcher, got out of his patrol car, and approached the Fusion from the passenger's side. *Id.* (front-facing camera, showing the Fusion and Lt. Stopper pulling to the

shoulder at about the 2:21 mark). As he approached the Fusion, Lt. Stopper noticed another person in the car for the first time. The person was in the backseat. A few moments after Lt. Stopper reached the Fusion, the second person sat up suddenly, and it appeared she just had awakened. As this passenger sat up, Lt. Stopper was explaining why he had pulled Mr. Acevedo over. Lt. Stopper then asked Mr. Acevedo for his driver's license. After handing Lt. Stopper his license, Mr. Acevedo asked a question about the positioning of his GPS system, which was one of the items Lt. Stopper had observed on the Fusion's windshield. Lt. Stopper answered Mr. Acevedo's question, then asked to see his proof of insurance.

Mr. Acevedo promptly handed Lt. Stopper his proof of insurance. During the July 10 hearing, Lt. Stopper testified that, while Mr. Acevedo handed him the proof of insurance documents, he also observed the car's registration paperwork. Though it is not clear when Mr. Acevedo actually handed his registration paperwork to Lt. Stopper, Lt. Stopper testified—after reviewing his report to refresh his memory—that he observed the date on the registration as Mr. Acevedo handed him the proof of insurance documents. Lt. Stopper noted that the car was registered on November 8, 2016—just six days before the stop.

During this initial interaction, Lt. Stopper observed several things that piqued his suspicion. First, he noticed an overwhelming smell of air freshener coming from the Fusion as he spoke to Mr. Acevedo. Lt. Stopper also saw three black ice air fresheners—two hanging on the rear-view mirror and one lying on top of the deck above the back seats. He noticed that all three air fresheners appeared new. None were sun-faded. Second, Mr. Acevedo's proof of insurance on the car showed that the policy period began November 8, 2016, and ended just two months later. Lt. Stopper found this conspicuously unusual because, in his experience, most motorists carry car insurance with policy-periods lasting six months to one year. Third, Lt.

3

Stopper noticed that the key in the ignition was not on a key chain and that it was the only key on the key ring. And finally, Lt. Stopper saw three cell phones in the car.[1]

Lt. Stopper found all of these things suspicious. From his more than 300 hours of drug-interdiction training and 10 years' experience as a full-time officer,[2] he knew that drug traffickers often place strong-smelling air fresheners in their vehicles hoping to prevent drug dogs from locating drugs hidden in the vehicle. And he knew that drug traffickers often carry multiple cell phones—one for personal use and one for drug-trafficking purposes. Lt. Stopper also testified that drug traffickers often use "drop cars"—that is, vehicles that traffickers conceal drugs in and leave in a parking lot for the next person to pick up. He explained that drop cars usually have been registered in the driver's name only recently and that traffickers often do not carry the car's key on a key chain with personal items. Lt. Stopper also testified that it is common for drug traffickers to purchase short-term insurance for drop cars.

After this initial interaction with Mr. Acevedo, and with the intent to investigate the traffic stop and other criminal activity, Lt. Stopper asked Mr. Acevedo to accompany him back to his patrol car while he checked on Mr. Acevedo's documents. Mr. Acevedo agreed and Lt. Stopper told Mr. Acevdeo that he would just issue him a warning if "everything checks out." *Id.* (front-facing camera between the 2:55–3:56 mark). When both men got into the patrol car, Lt.

---

[1] During cross-examination at the July 10 hearing, Ms. Collazo's counsel suggested that her cell phone was in her jacket when Lt. Stopper approached the Fusion for the first time and so he could not have seen her phone. Lt. Stopper responded, asserting that he saw three cell phones. The court found no reason to discredit Lt. Stopper's testimony on this point.

[2] Lt. Stopper also testified that he has performed more than 10,000 traffic stops and that he has served as part of the Geary County Sheriff's Department's interdiction team during the past three years. This testimony not only establishes that Lt. Stopper is aptly named; it also enhances the credibility of his assessment of the circumstances producing his suspicions.

4

Stopper turned on the inside, passenger-side camera and began recording his conversation with Mr. Acevedo.[3] He also began conducting his usual records checks.

Lt. Stopper testified that the quickest he could write a traffic ticket like the one here would be about 10 minutes, but that his traffic stops usually last about 10 to 15 minutes. Factors contributing to this duration include checking the driver's registration, insurance, and whether the driver has any outstanding warrants. Sometimes, this interaction includes checking the driver's criminal history, which Lt. Stopper can do only by calling his dispatcher. And it also includes waiting on dispatch to send him the ticket number. Lt. Stopper also testified that it is his general practice to wait to fill out the ticket until he has finished all of his records checks, and that he followed this practice during the November 14, 2016 stop.

The two men talked while Lt. Stopper began the records checks necessary to complete the traffic stop. Lt. Stopper asked Mr. Acevedo where he was headed and where he was coming from. Mr. Acevedo responded that he was headed back home to New York after a week-long trip to Disneyland in Anaheim, California. Mr. Acevedo then asked Lt. Stopper where he could position the GPS so that it didn't obstruct his view. Lt. Stopper answered his question, but explained that the bigger safety concern was following the car in front of him too closely.

Lt. Stopper then directed the conversation in a new direction. He asked Mr. Acevedo several questions about his travel plans. Those questions included: (1) whether Mr. Acevedo and his passenger had driven non-stop from New York to California; (2) when they had left New York for California; (3) whether Mr. Acevedo or his passenger knew anyone in Anaheim; (4) where they had stayed while in Anaheim; and (5) when they had arrived in Anaheim. Mr. Acevedo explained that his passenger was scared to fly, so they had driven non-stop from New

---

[3] The patrol car's front-facing camera still was recording too. The court bases its time-measurements on this front-facing camera's time clock.

5

York to California, each taking turns driving while the other one slept. He told Lt. Stopper that neither he nor his passenger knew anyone in Anaheim, and that they had stayed at a Residence Inn hotel. But Mr. Acevedo's answers to Lt. Stopper's other questions were vague. Mr. Acevedo stated that they had left New York about a week before, but seemed unable to answer Lt. Stopper's question about when they had arrived in Anaheim. When asked again a few moments later, Mr. Acevedo stated that he thought they had arrived in Anaheim the previous weekend. Throughout this conversation, which lasted about four minutes, Lt. Stopper can be heard clicking a mouse and typing on his computer.

About five minutes after he approached Mr. Acevedo's car on foot, Lt. Stopper asked Mr. Acevedo who his passenger was. Mr. Acevedo responded that it was his girlfriend. When asked her name, Mr. Acevedo said that her first name was Jessica but that he did not know her last name because they had just met. After hearing this answer, Lt. Stopper radioed dispatch, telling the dispatcher Mr. Acevedo's license plate and driver's license numbers. He also radioed an officer operating a K-9 Unit, Sergeant Ricard.

Lt. Stopper then left Mr. Acevedo in his patrol car and went to talk with Jessica, who was still sitting in the back seat of the Fusion. Lt. Stopper asked Jessica the same questions he asked Mr. Acevedo. But she gave different answers. She told Lt. Stopper that her name was Yesenea, that she and Mr. Acevedo—whose first and last name she knew—had been dating for a year and that the trip to Disneyland was to celebrate their anniversary together. She also said that they had stayed at a Marriot hotel, and that their visit had lasted two days.[4] This conversation with

---

[4] During the July 10 hearing, Mr. Acevedo's counsel attempted to explain the inconsistencies in Mr. Acevedo and Ms. Collazo's stories while cross-examining Lt. Stopper. The court does not consider this evidence here for two reasons. First, as explained below, the court's ruling here does not rest on the inconsistencies in Mr. Acevedo and Ms. Collazo's stories. And second, counsel's explanation is based on facts not known to Lt. Stopper during the November 14, 2016 stop. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968) (limiting the question whether reasonable suspicion existed to "the facts available to the officer at the moment of the seizure" (citation omitted)).

Jessica—who is the Yesenea Collazo charged in the case—lasted about a minute. Ex. 1 (front-facing camera beginning at 8:55).

After talking with Ms. Collazo—a little more than seven minutes after the traffic stop began—Lt. Stopper returned to his patrol car, radioed for a K-9 Unit, and began writing the traffic-stop ticket. At this time, Lt. Stopper testified that he intended to detain Mr. Acevedo and Ms. Collazo until the K-9 Unit arrived. The K-9 Unit driven by Sergeant Ricard arrived a few minutes later—roughly 9 or 10 minutes into the traffic stop. Lt. Stopper remained in his patrol car with Mr. Acevedo. While Sergeant Ricard walked the drug dog around the outside of the Fusion, Lt. Stopper told Mr. Acevedo that he was going to give him a verbal warning about the items in the windshield, but was going to give him a written warning for following the car in front of him too closely.

Lt. Stopper then asked Mr. Acevedo a few more questions, and, about 11 minutes after Lt. Stopper first had interacted with Mr. Acevedo, the drug dog alerted. About the same time, one can hear Lt. Stopper writing on something. Also, Lt. Stopper radioed dispatch again. And, about 13 minutes into the stop, Lt. Stopper returned Mr. Acevedo's paperwork to him, issued a copy of the written warning, and informed him that the drug dog had alerted. Lt. Stopper then explained that he and Sergeant Ricard were going to search the Fusion.

Later, after transporting the Fusion to a Geary County warehouse, officers found heroin in a compartment under the Fusion's front passenger seat. It is this heroin that Mr. Acevedo and Ms. Collazo ask the court to suppress.

**II. Analysis**

Both Mr. Acevedo and Ms. Collazo assert that Lt. Stopper lacked reasonable suspicion to initiate the November 14, 2016 traffic stop. Also, both defendants assert that Lt. Stopper

7

prolonged the initial traffic stop unconstitutionally when he detained them while waiting for the K-9 Unit to arrive. The court considers these issues, separately, below. But, the court first considers the government's argument that Ms. Collazo has no standing to assert her motion.

   A.   **Standing of Ms. Collazo**

Ms. Collazo had no possessory interest in the vehicle, itself, and thus she lacks standing to challenge the vehicle search. *See United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001) (explaining that a passenger lacks standing to challenge a vehicle search if she has no possessory or property interest in the vehicle). But Ms. Collazo moves to suppress the evidence found in the vehicle search as poisonous fruit of an illegal stop and seizure.

Ms. Collazo may challenge the lawfulness of the traffic stop and seizure as a violation of her Fourth Amendment rights. *See id.* (explaining that while a defendant cannot challenge a vehicle search if she lacks the requisite ownership interest in the vehicle, she "'may nonetheless contest the lawfulness of [her] own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention.'" (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000))).

But, to suppress evidence discovered as a fruit of an unlawful detention, Ms. Collazo must establish two things: (1) the detention violated her Fourth Amendment rights; and (2) the existence of "a factual nexus between the illegality and the challenged evidence." *Nava-Ramirez*, 210 F.3d at 1131 (citation omitted). To satisfy the nexus requirement, "[a]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Id.* (footnote and citation omitted). That is, a detained passenger who seeks to suppress evidence found in a vehicle owned (or otherwise possessed) by someone else must

8

present evidence "that had [s]he . . . requested permission or otherwise attempted to depart the scene, [s]he would have been able to leave in [the owner's] car." *Id.*

Ms. Collazo has satisfied neither requirement. First, for reasons explained in greater detail below, Mr. Acevedo and Ms. Collazo cannot establish that the November 14, 2016 traffic stop or the ensuing detention violated the Fourth Amendment. The court concludes that Lt. Stopper's traffic stop was supported by reasonable suspicion of a traffic violation. The court also determines that Lt. Stopper did not unconstitutionally prolong the traffic stop to wait on a K-9 Unit because he had a particularized and objective basis to suspect legal wrongdoing. Thus, Ms. Collazo cannot establish the first requirement for suppression because, the court concludes, the detention did not violate her Fourth Amendment rights.

But even if Ms. Collazo could make this showing, she cannot establish the second requirement. She presented no evidence showing that law enforcement would not have discovered the heroin but for her allegedly unconstitutional detention. She presented no evidence to demonstrate that had she requested permission or otherwise attempted to depart the scene, she would have been able to depart in Mr. Acevedo's vehicle. The government's standing argument is well-taken.

The court next turns to consider Mr. Acevedo and Ms. Collazo's suppression arguments.

### B. Validity of the Traffic Stop and Detention

"[A] traffic stop is a seizure under the Fourth Amendment . . . ." *United States v. Salas*, 756 F.3d 1196, 1200 (10th Cir. 2014) (citing *United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008)). But a traffic stop is a limited seizure and "more like an investigative detention than a custodial arrest." *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Courts thus analyze stopping and detaining a

9

vehicle on a public roadway under the principles of *Terry v. Ohio*. *Id.* Under *Terry*, an investigatory detention is constitutional if it is: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstance which justified the interference in the first place." *Terry*, 392 U.S. at 20.

### 1. Initial Traffic Stop

A traffic stop is "justified at its inception" where "'the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that "this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."'" *Salas*, 756 F.3d at 1200–01 (quoting *Martinez*, 512 F.3d at 1272). "Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances . . . ." *Id.* at 1201 (citations omitted). And, "the law expects and takes account of human . . . frailties, requiring less, far less, than perfect certainty of a traffic violation before an officer may initiate a brief investigatory stop." *United States v. Esquivel-Rios*, 725 F.3d 1231, 1235 (10th Cir. 2013); *accord United States v. Amarillas-Norzagaray*, 22 F. Supp. 3d 1184, 1187 (D. Kan. 2014).

During the suppression hearing, Lt. Stopper testified that he saw Mr. Acevedo's grey Fusion traveling about a second behind the car in front of it—a maroon Prius. Lt. Stopper explained that, employing the two-second rule of thumb used by Kansas officers, he believed this driving distance was unsafe under Kan. Stat. Ann. § 8-1523(a). Section 8-1523(a) provides that, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." The Tenth Circuit repeatedly has "specifically approved the two-second rule as supporting reasonable suspicion to effect a traffic stop under § 8-1523(a)." *United*

*States v. Hunter*, 663 F.3d 1136, 1143 (10th Cir. 2011) (citation omitted); *see also United States v. Sanchez-Cruz*, No. 14-20037-01-JAR, 2014 WL 5760243, at *4 (D. Kan. Nov. 5, 2014) (finding reasonable suspicion for a traffic stop under Kan. Stat. Ann. § 8-1523(a) by employing the two-second rule). The "two-second rule" refers to a distance of at least two-seconds between the lead and trail vehicles. *Hunter*, 663 F.3d at 1143.

Nonetheless, Mr. Acevedo and Ms. Collazo assert that Lt. Stopper did not have reasonable suspicion to believe that Mr. Acevedo had violated Kan. Stat. Ann. § 8-1523(a). They contend that when Lt. Stopper pulled them over, it was a clear and sunny day; the road was dry. These conditions, they argue, made the distance between their vehicle and the maroon Prius "reasonable and prudent" under Kan. Stat. Ann. § 8-1523(a), and so "[t]here was insufficient ca[u]se for Lt. Stopper to believe that Mr. Acevedo was following too close." Doc. 19 at 4; *accord* Doc. 18 at 4. Mr. Acevedo and Ms. Collazo's argument is misplaced.

Deciding the issue presented by these motions does not require the court to decide whether Mr. Acevedo violated Kan. Stat. Ann. § 8-1523(a). Instead, it requires the court to decide whether Lt. Stopper had an articulable, reasonable suspicion that Mr. Acevedo had violated Kan. Stat. Ann. § 8-1523(a). *Salas*, 756 F.3d at 1200-01. During the July 10 hearing, Lt. Stopper testified that he observed the Fusion cross a line on the highway about one second after he had observed the maroon Prius cross that same line. The Circuit has described its view of an officer's time-based reasonable suspicion: "[W]e have specifically approved the two-second rule as supporting reasonable suspicion to effect a traffic stop under [Kan. Stat. Ann.] § 8-1523(a)." *Hunter*, 663 F.3d at 1143. In sum, the credible facts here establish that Lt. Stopper both had probable cause and a reasonable, articulable suspicion that Mr. Acevedo had violated one of Kansas' traffic laws. This justified the traffic stop at its inception. *Salas*, 756 F.3d at

11

1200-01. *Hunter*, 663 F.3d at 1143–44 ("Trooper Nicholas's use of the two-second rule of thumb and determination that Mr. Hunter's car was following a semi at about a one-second interval on an interstate highway, under normal traffic and road conditions, together with his ten to fifteen second observations, incorporated 'due regard' for the statutory factors and provided the minimal level of objective justification required for reasonable suspicion that Mr. Hunter's car was proceeding in violation of § 8-1523(a)."); *Amarillas-Norzagaray*, 22 F. Supp. 3d at 1187 (concluding that reasonable suspicion existed for a traffic stop under Kan. Stat. Ann. § 8-1523(a) where "the trooper testified that [the defendant] was following too closely—between 1.25 and 1.5 seconds behind a semi—which was supported by a video admitted during the suppression hearing").[5]

Because the court concludes that Lt. Stopper had reasonable suspicion to stop Mr. Acevedo under Kan. Stat. Ann. § 8-1523(a), it need not consider whether he had a reasonable suspicion that Mr. Acevedo also violated Kan. Stat. Ann. § 8-1741. That is, the court need not consider whether Lt. Stopper's second reason for stopping Mr. Acevedo and Ms. Collazo—*i.e.*, that items in the windshield obstructed Mr. Acevedo's view—also was supported by reasonable suspicion. Given this conclusion, the court turns to defendants' second argument.

2. *Prolonged Detention*

Mr. Acevedo and Ms. Collazo next argue that, even if the traffic stop was justified at its inception, Lt. Stopper unconstitutionally prolonged the traffic stop because his investigatory detention was not reasonably related to the stop.

---

[5] The court does not perceive the two-second rule as a talisman. That is, it does not, when invoked, provide law enforcement officers with a foolproof rationale for justifying a traffic stop. Instead, the Tenth Circuit's cases explain that the officer's basis for suspecting a violation of the rule must be a "reasonable" one. *Salas*, 756 F.3d at 1200-01. While some officer judgments can fail this requirement, that concern does not present itself here. The video memorializes the view that Lt. Stopper had of defendants' car and the one it was following. And, as already discussed, it establishes an actual basis in fact for Lt. Stopper's suspicion that Mr. Acevdeo was violating the two-second principle.

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (citations omitted). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* (citation omitted). So, authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citation omitted). The Supreme Court has held that these tasks include "determining whether to issue a traffic ticket," and "ordinary inquiries incident to [the traffic] stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615 (citations omitted).

Mr. Acevedo and Ms. Collazo contend that Lt. Stopper did not pursue his traffic-based inquiry expeditiously and thus he improperly prolonged the traffic stop beyond its mission. Mr. Acevedo asserts that the fact that "Lt. Stopper did not ask Mr. Acevedo any questions related to the traffic stop in the four minutes they sat together in the patrol car before Lt. Stopper contacted dispatch and requested the K9 unit" supports this challenge. Doc. 19 at 7; *see also* Doc. 18 at 7–8 (Ms. Collazo's Motion, contending that Lt. Stopper extended the stop by asking questions unrelated to the traffic stop). The court disagrees. A small part of the officer's four-minute conversation with Mr. Acevedo is devoted to Lt. Stopper answering Mr. Acevedo's questions about where he could position the GPS unit so that it did not block his view unlawfully. The remainder of their conversation is about Mr. Acevedo's travel plans. In our Circuit, "an officer may ask routine questions about the driver's travel plans" during a traffic stop without exceeding the stop's scope. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (citation

omitted). And, Lt. Stopper's testimony and the video of the stop establish that Lt. Stopper asked Mr. Acevedo about his travel plans while putting Mr. Acevedo's license, insurance, and registration information into his computer so that he could conduct the permissible checks about them. The facts establish that Lt. Stopper did not prolong the stop by talking to Mr. Acevedo—he pursued the stop's mission while simultaneously asking Mr. Acevedo about his travel plans.

Mr. Acevedo and Ms. Collazo next assert that, even if Lt. Stopper did not prolong the stop by questioning Mr. Acevedo, he extended the stop unconstitutionally when he left the patrol car, reapproached the Fusion, and spoke to Ms. Collazo. Doc. 19 at 8; *see also* Doc. 18 at 7–8 (Ms. Collazo's Motion, contending that Lt. Stopper extended the stop by asking questions unrelated to the traffic stop). The government responds, arguing that the officer's conversation with Ms. Collazo did not prolong the traffic stop beyond its mission. Here, the court need not resolve this dispute to decide the motions to suppress. While an officer may not conduct unrelated checks "in a way that prolongs the stop," *Rodriguez*, 135 S. Ct. at 1615, he may prolong the detention "for purposes of questioning unrelated to the initial traffic stop" if: "(1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter," *Bradford*, 423 F.3d at 1157 (citing *United States v. Cervine*, 347 F.3d 865, 868–69 (10th Cir. 2003)). The government contends that "Lt. Stopper had reasonable suspicion derived almost from the inception of the encounter to detain the defendants to investigate drug trafficking activity." Doc. 20 at 20. The credible facts substantiate the government's argument.

"When determining whether reasonable suspicion exists, [courts] look to the 'totality of the circumstances' to see whether the officer had a 'particularized and objective basis for suspecting legal wrongdoing.'" *Bradford*, 423 F.3d at 1157 (quoting *United States v. Arvizu*,

14

534 U.S. 266, 273 (2002)). The court must "evaluate the officer's conduct in light of common sense and ordinary human experience, at the same time granting deference to a trained officer's 'ability to distinguish between innocent and suspicious circumstances.'" *United States v. Powell*, 277 F. App'x 782, 785 (10th Cir. 2008) (quoting *United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008)). "The reasonable suspicion standard thus 'requires an officer to have "some minimal level of objective justification," but he or she "need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for [an investigative] stop."'" *Id.* (quoting *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007)).

In the six or so minutes it took Lt. Stopper to approach the Fusion, inform Mr. Acevedo why he had pulled him over, ask for Mr. Acevedo's proof of insurance, return to his patrol car with Mr. Acevedo, and begin running the routine records checks incident to a traffic stop, Lt. Stopper had noted eight factors he considered to indicate drug-related activity. He observed six of these eight factors even before he asked Mr. Acevedo to return with him to his patrol car. They are: (1) the overwhelming odor of air fresheners, which all appeared new; (2) Mr. Acevedo registered the vehicle just six days before the stop; (3) Mr. Acevedo's insurance policy was valid for just two months; (4) there were three cell phones in the vehicle for two passengers; (5) the key in the ignition was not on a key chain; and (6) Ms. Collazo appeared very nervous when she woke up and noticed that Lt. Stopper had pulled them over.

Lt. Stopper observed a seventh indicator soon after he and Mr. Acevedo got into the patrol car. During Lt. Stopper's initial conversation with Mr. Acevedo, Mr. Acevedo told Lt. Stopper that he had been in California since the previous weekend. Lt. Stopper noted that this would mean that, when Mr. Acevedo registered the Fusion in New York, he and the Fusion

15

actually were in California. Lt. Stopper noted an eighth indicator during the same conversation. Mr. Acevedo told Lt. Stopper that he and his passenger had driven non-stop from New York to California to visit Disneyland, but knew no one in the Anaheim area. Mr. Acevedo explained that they drove instead of flying because his passenger—also his girlfriend—was afraid to fly. But when Lt. Stopper asked what his girlfriend's name was, Mr. Acevedo could only provide her first name, which he said was Jessica, and explained that he did not know her last name because they had just met.

Some of these eight factors persuade the court that reasonable suspicion existed to detain Mr. Acevedo and Ms. Collazo, while others do not. The Tenth Circuit repeatedly has acknowledged that "a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs." *United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998) (first citing *United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997); then citing *United States v. Hernandez-Rodriguez*, 57 F.3d 895, 898 (10th Cir. 1995); then citing *United States v. Stone*, 866 F.2d 359, 362 (10th Cir. 1989)); *accord Powell*, 277 F. App'x at 785–86. Our Circuit also has held that the other seven factors Lt. Stopper observed, though insufficient to support reasonable suspicion on their own, can indicate illegal activity and so properly may contribute to reasonable suspicion.[6]

---

[6] *See, e.g.*, *United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) ("The recent registration of a vehicle can contribute to reasonable suspicion" and so is "a relevant factor in determining whether reasonable suspicion exists." (citation omitted)); *id.* at 1230 (noting that "extreme and persistent nervousness" can contribute to reasonable suspicion of illegal activity (citation omitted)); *United States v. Leyva*, 442 F. App'x 376, 379–80 (10th Cir. 2011) (stating that finding "just a single key in the ignition" can "sometimes indicate that the occupants may be drug couriers" (citing *United States v. Calvo-Saucedo*, 409 F. App'x 21, 23–25 (7th Cir. 2011)); *Powell*, 277 F. App'x at 786 ("An officer's suspicion may reasonably be aroused where, as here, a defendant's proposed factual scenario, if not entirely inexplicable, seems unlikely." (citing *United States v. Kopp*, 45 F.3d 1450, 1453–54 (10th Cir. 1995))); *Bradford*, 423 F.3d at 1157–58 (considering the defendant's inability to "explain the timing discrepancies of her story" as one factor contributing to reasonable suspicion of illegal activity); *United States v. Arciga-Bustamante*, 276 F. App'x 716, 723–24 (10th Cir. 2006) (considering how recently a driver obtained insurance on the vehicle as one factor among several giving rise to reasonable suspicion of illegal activity).

In contrast, the court awards no significance to Ms. Collazo's nervousness, or the presence of a single key in the Fusion's ignition. The court expects a person who, awakens from a nap, to find a law enforcement officer standing beside her car to react nervously. The court does not find her nervousness indicative of illegal activity. *See Moore*, 795 F.3d at 1230 (explaining that courts give little weight to nervousness, but that they "afford 'somewhat more weight' to '[e]xtreme and persistent nervousness'" (citation omitted)). The court also questions the value of Lt. Stopper's single-key observation. It has too many innocent explanations. *See Bradford*, 423 F.3d at 1157 ("Some items motorists might possess must be 'outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous . . . .'" (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997))). Indeed, the Tenth Circuit has explained that a "lone key on a single ring" suggests, "however weakly," that the car is not one that a defendant "drove regularly." *United States v. Guerrero*, 472 F.3d 784, 788 (10th Cir. 2007). So, the court declines to attach any significance to Lt. Stopper's single-key observation and concludes that this observation does not contribute to a finding of reasonable suspicion on the facts presented here. *See, e.g.*, *United States v. Medina*, No. 14-410019-EFM-1, 2014 WL 3107965, at *8 (D. Kan. July 8, 2014) (concluding that a trooper's single-key observation was "insignificant" even though it "must be included for consideration"). The remaining six factors, however, are persuasive enough to justify Lt. Stopper's suspicion as a reasonable one.

A few of those indicators require no special training to find suspicious. The Fusion's registration paperwork disclosed that the vehicle was registered in New York on November 8, 2016. Mr. Acevedo told Lt. Stopper that he and the Fusion had been in Anaheim, California, since November 5, 2016, or November 6, 2016. So, Mr. Acevedo's travel plans did not fit with his car's registration paperwork. And, though they had not been dating long enough for him to

know his "girlfriend's" last name, he told Lt. Stopper that they had driven across the country, non-stop, to visit Disneyland. The decision to take such a time-consuming, laborious trip on a whim, and with someone known for so short a time, is suspect. To be sure, our country includes scores of spontaneous people. But, when the court adds these two factors to the remaining four, Lt. Stopper's suspicion of illegal activity resembles something more substantial than a conclusory or baseless hunch.

Lt. Stopper testified that, based on his training and experience, the four factors all indicated drug-related activity. He explained that drug traffickers often place strong-smelling air fresheners in vehicles in hopes of preventing drug dogs from locating contraband hidden in the vehicle. And, he explained that drug traffickers often carry multiple cell phones: one for personal use and one dedicated to drug trafficking. Lt. Stopper also testified that drug traffickers usually use recently registered vehicles with short-term insurance—called "drop cars"—to transport drugs.

The court finds that these factors provided Lt. Stopper with an objective, articulable basis to suspect illegal drug activity before he spoke with Ms. Collazo. The Fusion's paperwork bore many of the characteristics of a drop car. Mr. Acevedo's story about his travel plans was implausible and inconsistent with the Fusion's registration paperwork. The overwhelming smell of air freshener, which appeared to be recently opened, suggested to an officer of Lt. Stopper's experience that Mr. Acevedo and Ms. Collazo were trying to hide the smell of contraband. And, Lt. Stopper saw three cell phones in a car that include just two occupants—indispensable tools of a drug trafficker's trade. All of these factors, taken together and with proper deference to Lt. Stopper's experience and training, amount to a reasonable suspicion of illegal drug activity. *Cf. Moore*, 795 F.3d at 1231 ("Moore's nervousness, his admission that he had been in trouble

18

before, and the recent addition of his name to the vehicle's registration, when considered together, are sufficient to indicate criminal activity."); *Bradford*, 423 F.3d at 1157–58 (finding that reasonable suspicion existed where the defendant's travel plans were implausible and included unexplained discrepancies, such as picking up "the rental car at Los Angeles International Airport prior to a week-long family reunion even though the car's rental agreement reflected that it had been picked up only two days earlier"); *Powell*, 277 F. App'x at 787–88 (collecting similar cases and finding that reasonable suspicion existed in part because the defendant's vehicle smelled strongly of air freshener and his travel plans were implausible); *United States v. Perales*, No. 08-40055-JAR, 2008 WL 4974807, at *4 (D. Kan. Nov. 19, 2008) (finding that reasonable suspicion existed where, among other things, the defendant's travel plans were unusual and "the vehicle had been recently insured and . . . registered within the past six months").

The court thus denies Mr. Acevedo and Ms. Collazo's motions to suppress. The court will discuss the schedule to govern the remainder of this case at the status conference, set for August 14, 2017 at 9:00 a.m. in Topeka Courtroom 401. The court directs counsel to confer about such a schedule.

**IT IS THEREFORE ORDERED THAT** defendant Alvin Acevedo's Motion to Suppress (Doc. 19) is denied.

**IT IS FURTHER ORDERED THAT** defendant Yesenea Collazo's Motion to Suppress (Doc. 18) is denied.

**IT IS SO ORDERED.**

**Dated this 10th day of August, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**